# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 11-CR-165 |
| v. | : | JUDGE ALGENON L. MARBLEY |
| CLINTON PARKER, | : | Magistrate Judge Elizabeth Preston Deavers |
| Defendant. | : | |

## OPINION & ORDER

### I. INTRODUCTION

This matter is before the Court on Defendant Clinton Parker's Motion to Suppress Physical Evidence and Statements and Request for Evidentiary Hearing ("Motion to Suppress"). This Court held a suppression hearing on November 9, 2011. For the reasons set forth herein, the Motion to Suppress is **DENIED**.

### II. BACKGROUND

*A. Factual History*

On Saturday March 20, 2010, Columbus Division of Police Officers Jeremy Sampson and Joe Burkey were nearing the intersection of Old Courtright Road and Westpoint Drive in Columbus, Ohio when they noticed a vehicle bearing Indiana license plates parked in the lot of an apartment building located at 3780 Westpoint Drive. Officer Sampson observed that the vehicle was parked in a spot away from the entrance of the apartment building, even though there were a number of closer spots available. At the suppression hearing, however, counsel for the Defendant presented evidence that the parking lot of the apartment building had reserved

spaces for the residents and that there was a sign at the entrance of the lot so indicating. Officer Sampson also observed that two men, one who would later be identified as Defendant Clinton Parker ("Defendant" or "Parker"), were sitting in the front seats of the vehicle, and that the windows of the vehicle were rolled down.[1] Officer Sampson had made narcotics arrests at the same apartment building in the past.

Officers Sampson and Burkey contacted Officer Jeremy Phalen who was working in plain clothes capacity in an unmarked police vehicle that night and explained to Officer Phalen that they believed a narcotics transaction might be taking place in the parking lot of the apartment building. Officer Phalen arrived at the lot, "got into position and aired the activity from the vehicle." (Doc. 33.) From his vehicle, Officer Phalen observed the following series of events: (1) a woman got out of the vehicle and walked into the apartment; (2) the same woman returned to the vehicle and got into the back seat; (3) everyone in the vehicle huddled toward the middle and appeared to be looking at something; and (4) the vehicle pulled a few feet forward as if it was leaving, but stopped, and was positioned halfway out of the parking spot.

There was conflicting testimony and evidence presented at the suppression hearing regarding the duration of Officer Phalen's observations. Officer Phalen testified that his surveillance lasted approximately five minutes, and then he advised Officers Sampson and Burkey to enter the parking lot and investigate because he suspected the people in the vehicle were smoking marijuana. Officer Sampson testified that Officer Phalen's observations lasted several minutes. Defendant presented evidence, however, that the CAD report and dispatch recordings from that night indicated that Officer Phalen arrived at the scene and initiated his

---

[1] At the suppression hearing, Officer Burkey testified that the passenger's side window was down, but that he could not recall if the driver's side window was also down. Parker was sitting in the passenger seat of the vehicle.

observation at approximately 7:41 p.m., but that at 7:43:15 p.m., there was a request for two additional police cruisers to come to the scene as back-up. (Doc. 40.) There was also a voice recording at 7:43:15 p.m. in which one of the Officers stated: "We want to get them separated, we've got a bunch of cash." (*Id.*)

After speaking to Officer Phalen, Officer Burkey pulled into the lot and parked the police cruiser on the left side of the parking lot entrance, perpendicular to Parker's vehicle, but in a manner that did not block the vehicle's egress.[2] Officer Burkey exited the police cruiser and approached the passenger's side of the vehicle, where Defendant was sitting, and Officer Sampson approached the driver's side. As he got closer to the passenger's side of the vehicle, Officer Burkey smelled the odor of freshly burnt marijuana. He asked Defendant about the smell, and Defendant denied having been smoking marijuana, but said that some men had been smoking marijuana outside of the vehicle at an earlier time.

Officer Burkey asked Defendant to exit the vehicle, but Defendant attempted to remove a sweatshirt he was wearing. Officer Burkey instructed Defendant, several times, to leave his sweatshirt on prior to stepping out of the vehicle because he noticed a large bulge in the sweatshirt pocket. In response, Defendant stated, "This isn't even my jacket." (Doc. 33.) Once Defendant stepped out of the vehicle, Officer Burkey searched Defendant's person for contraband, found a freshly burnt marijuana blunt, and put Defendant into the rear of the police cruiser.

Officer Sampson questioned Pack who was sitting on the driver's side of the vehicle. Office Sampson asked Pack for identification, which Pack provided, but the Officers eventually

---

[2] There was conflicting testimony at the suppression hearing as to exactly where the police cruiser was parked in relation to Parker's vehicle, but it was clear that the cruiser was not parked directly behind the vehicle or in a manner that would have prevented the vehicle from exiting the parking lot.

discovered the identification was inaccurate.  Officer Sampson observed that Pack's heart was beating fast and his hands were sweaty and shaking.  He asked Pack if there were any guns in the vehicle, and Pack replied, "This isn't my car, it is his."  (Doc. 33.)  Officer Sampson discovered a large roll of money in Pack's front left pant pocket.

After both Parker and Pack were put into police cruisers, Officer Burkey picked up the sweatshirt Defendant had been wearing and found a plastic bag inside that contained $9,880.00 in counterfeit United States currency.  The Officers then searched the vehicle and recovered approximately two ounces (58 grams packed weight) of powder cocaine from the vehicle's unlocked glove box and a duffle bag in the trunk of the vehicle, which contained a computer printer, paper, and prescription bottle with Defendant's name on it.

Defendant was transported to Columbus Police Department headquarters where he signed a *Miranda* waiver and made incriminating statements.  Defendant was thereafter indicted under 18 U.S.C. § 472, which prohibits, *inter alia*, possession or concealment of "any falsely made, forged, counterfeited, or altered obligation or other security of the United States."

*B. Procedural History*

Defendant filed his Motion to Suppress on October 4, 2011.  (Doc. 33.)  The suppression hearing took place on November 9, 2011, and after the conclusion of the hearing, this Court entered a scheduling order setting deadlines for supplemental briefing. (Doc. 38.)  Briefs have been submitted and this motion is now ripe for decision.

### III. LAW & ANALYSIS

Defendant makes a two-part argument in support of his Motion to Suppress.  First, Defendant argues that an illegal seizure occurred because the officers had no reasonable suspicion of criminal wrongdoing when the seizure occurred.  Specifically, Defendant argues

4

that a *Terry* stop occurred prior to the time Officer Burkey smelled freshly burnt marijuana. Next, Defendant contends that all evidence obtained as a result of the subsequent search of Defendant's person and vehicle must be suppressed under the exclusionary rule. This Court needs to address the second part of Parker's argument only if it finds that an illegal seizure did, in fact, occur. Because this Court holds than an illegal seizure did *not* take place, it is unnecessary to address Defendant's arguments related to the exclusionary rule.

### A. Law on Illegal Seizure

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. The Sixth Circuit has articulated three types of permissible encounters between police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Gross*, 662 F.3d 393, 398 (6th Cir. 2011) (quoting *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2008)).

A police officer does not violate the Fourth Amendment's prohibition against unreasonable seizures when he or she approaches an individual in a public place and asks questions, as long as reasonable person would feel free to disregard the police officer and go about his or her business. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see United States v. Drayton*, 536 U.S. 194, 200–01 (2002) (explaining that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen," and "[i]f a reasonable person would feel free to terminate the encounter, then he or she has not been seized"); *United States v. Peters*, 194 F.3d 692, 698 (6th Cir. 1999) ("Absent

5

coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the [officer's] request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment.").

A consensual encounter becomes a seizure when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Examples of circumstances indicating a seizure has occurred include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled." *Id.* at 554–55.

Once it is determined that a consensual encounter has turned into a seizure, the Sixth Circuit engages in a two-part analysis to evaluate the constitutionality of the *Terry* stop. *United States v. Davis*, 514 F.3d 596, 608 (6th Cir. 2008). First, to justify a short, investigative, *Terry* stop, an officer must point to specific, articulable facts that gave rise to a reasonable suspicion that the suspect was engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir. 2004) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). More than just an officer's "inchoate and unparticularized suspicion or 'hunch'" is required. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30)). Second, the Court must consider "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the [officers'] conduct given their suspicions and the surrounding

circumstances." *Davis*, 514 F.3d at 608 (citing *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). The detention must be "sufficiently limited in time" and the investigative means used "the least intrusive means reasonably available." *Id.*

In *United States v. Koger*, the Sixth Circuit affirmed the district court's denial of a motion to suppress where, as here, the initial encounter was consensual. 152 F. App'x 429, 431 (6th Cir. 2005). The deputies in *Koger* had observed a vehicle stopped illegally on a highway, with the motor running and partially blocking the road. *Id.* at 429–30. The appellant appeared to be asleep or unconscious in the driver's seat. *Id.* at 430. When the deputies approached the vehicle, the appellant rolled down the window and the deputies immediately noticed a strong odor of marijuana. *Id.* Deputies learned appellant's license was suspended, asked appellant if there were any drugs or weapons in the vehicle, and the appellant eventually admitted there was a small bag of marijuana in the front of the vehicle. *Id.* Upon searching the vehicle, the deputies found the small bag of marijuana and a briefcase containing twelve additional bags and other incriminating evidence. *Id.* The Sixth Circuit affirmed the district court's denial of the motion to suppress in all respects, and agreed with the district court that the "initial approach to the car was lawful," the "deputies had probable cause to approach the vehicle and investigate," and "the strong smell of marijuana emanating from the vehicle provided both reasonable suspicion for further investigation and probable cause to search the car, and therefore that the search and discovery of evidence did not violate the Fourth Amendment." *Id.* at 431–32.

More recently, in *United States v. Dingess*, this Circuit affirmed the denial of a Defendant's motion to suppress holding that the evidence suggested that the officers had initiated a consensual encounter first, rather than a *Terry* stop, and that the officers had developed probable cause before the encounter ripened into a *Terry* stop or an arrest. 411 F. App'x 853,

855 (6th Cir. 2011). Two officers had been patrolling a high-crime area when they observed two men in a blue Buick parked in a common driveway of a duplex. *Id.* at 854. Prior to making these observations, the officers had heard that a man was selling drugs in a blue Buick at that address, and when the officers ran a check on the license plates, they discovered the driver had an arrest record including multiple narcotics, weapons, and resisting arrest charges. *Id.*

The officers conducted an unrelated traffic stop and about 20 minutes later, observed that the Buick was still parked in the driveway and decided to investigate. *Id.* They parked the cruiser on the street, which left the driveway entrance to the duplex clear, and each officer approached a side of the vehicle. *Id.* When they approached, they smelled burning marijuana, and as they moved closer, observed that the defendant was holding a blunt. *Id.* The defendant, without being asked, said that he was not doing anything and demanded the officers to move away from the vehicle, to which one officer replied that he smelled marijuana and saw the blunt. *Id.* An officer then instructed the defendant to get out the vehicle, a struggle ensued, and the officers observed a firearm. *Id.* at 854–55. The defendant was handcuffed and arrested. *Id.* A search of the defendant's person revealed a nine-millimeter pistol, and the defendant was later indicted for possession of a firearm by a convicted felon. *Id.* at 855.

On appeal, the defendant argued that the officers had engaged in a *Terry* stop without reasonable, articulable suspicion, but the *Dingess* Court disagreed. *Id.* 855–56. The officers' initial encounter was consensual because a reasonable person would have believed he or she was free to leave where the vehicle's egress was not blocked. *Id.* at 856. Furthermore, "because the officers smelled burnt marijuana emanating from [the defendant's] car and saw the defendant holding marijuana—establishing probable cause—*before* this encounter ripened into a seizure, the district court properly denied the motion to suppress." *Id.* (emphasis in the original); *but see*

*Gross*, 662 F.3d at 396–401 (holding that an unlawful seizure occurred when an officer blocked an appellant's legally parked vehicle into a parking spot when the officer had no particularized or objective basis for suspecting the appellant was engaging in criminal activity); *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) ("We agree with the district court's finding that the blocking of [the appellant's car] to determine the identity of the occupants and maintain the status quo while obtaining this information was a warrantless *Terry* seizure.") (internal quotations and citations omitted).

*B. Application of the Law on Illegal Seizure to the Facts of This Case*

This Court must determine, therefore, when a *Terry* stop began, and then whether Officer Burkey had developed reasonable suspicion that Parker was engaged in criminal activity at that time.

Before the Officers approached Parker's vehicle, Officer Phalen observed a series of events that, taken together, appeared suspicious, and he relayed his suspicions to Officers Burkey and Sampson. A woman exited and re-entered the vehicle, but the vehicle did not leave the lot. Instead, the people in the vehicle huddled toward the middle and then pulled the vehicle a few feet forward, halfway out of the parking spot. The Officers also knew that prior narcotics arrests had occurred in the same parking lot. Yet even when Officer Phalen instructed Officers Burkey and Sampson to investigate further, the Officers suspicion had not yet rose to the requisite level of reasonable suspicion of criminal activity to conduct a *Terry* stop. Therefore, when the Officers parked the vehicle in the lot, they had not yet developed reasonable suspicion—but nor had a seizure occurred.

As a threshold matter, this Court finds, as in *Dingess*, that the Officers' initial encounter was consensual. The Officers did not attempt to hinder Plaintiff's ingress or egress. They

9

parked their police cruiser in a manner that did not block Parker's vehicle. *See Dingess*, 411 F. App'x at 856. Furthermore, while approaching the vehicle, the Officers took no action to compel compliance. They refrained from displaying their weapons in a threatening manner or using tones of voice that would indicate compliance might be compelled. *Mendenhall*, 446 U.S. at 554–55.

A seizure began when Officer Burkey stood at the passenger's side of Parker's vehicle (while Officer Sampson stood on the other side), after smelling marijuana, and asked Parker if he was smoking marijuana. A reasonable person would not feel as though he or she could leave when two police officers were standing on either side of his or her vehicle inquiring as to whether any illegal activity was occurring.

When the encounter ripened into a seizure, however, Officer Burkey had "a particularized and objective basis" for suspecting Defendant was engaged in criminal activity. *See Baldwin*, 144 F. App'x at 679; *Dingess*, 411 F. App'x at 856 (explaining that the officers had probable cause once they "smelled burnt marijuana emanating from Dingess's car and saw the defendant holding marijuana"). Officer Burkey's suspicions became heightened when he observed a bulge in Defendant's sweatshirt and Defendant attempted to remove that sweatshirt several times before exiting the vehicle, claiming, "[t]his isn't even my jacket." (Doc. 33.) A reasonable officer could have suspected the bulge was a weapon, which would provide probable cause to search Defendant's person. Officer Burkey also used a reasonable "degree of intrusion" given "the situation at hand." *See Davis*, 514 F.3d at 608 (citing *Davis*, 430 F.3d at 354). Defendant does not, however, contest this point and "would concede that, once Burkey detected the order of marijuana, officers had probable cause to detain and search the vehicle." (Doc. 40.)

In his supplemental briefing, Defendant first argues that the Officers' testimony is unconvincing because "[c]learly at [7:43:15 p.m., when two additional cruisers were called and there was a recording that the Officers had found cash], Parker had already been removed from the vehicle and his jacket had been searched." (*Id.*) While it is true that the CAD report and dispatch recording evidence conflicts with the Officers' testimony and creates doubt as to whether Officer Phalen observed the parked vehicle for approximately five minutes before directing the other Officers to investigate further, the evidence does not undermine that fact that when the Officers parked their cruiser and made their initial approach toward the vehicle, the encounter was consensual. The evidence also does not undercut the fact that once Officer Burkey got close to the car and smelled the odor of freshly burnt marijuana, he then had reasonable suspicion that Defendant was engaged in criminal activity. Importantly, Defendant concedes that once Officer Burkey smelled marijuana he had probable cause to detain Defendant and search the vehicle, and this Court finds that an illegal seizure did not occur prior to that point.

The Defendant also contends, without much elaboration, that Officer Phalen's vehicle was parked 125 feet from Defendant's car and that he could tell the passengers were black but that he could not make out their "ages, clothing (with the exception of [the female's] yellow shirt), facial hair, eye wear, etc." (*Id.*) Defendant does not contest, however, that Officer Phalen was able to observe the female exit and re-enter the vehicle, that once she returned the passengers in the vehicle huddle toward the middle, or that the vehicle pull a few feet forward and stop. The latter are the observations upon which the Officers began to develop reasonable suspicion. Therefore, this Court finds unpersuasive the Defendant's argument related to the difficulty Officer Phalen had identifying the physical traits of the passengers.

Finally, Defendant argues that the *Dingess* case is distinguishable because in that case, the officers were parked on the street so as not to block the defendant's egress and this was the determining factor in the Circuit Court's analysis and conclusion that the defendant was seized legally. Parker argues that here, "although the officers did not physically block the vehicle's egress, they hindered it by parking on the wrong side of the road within a short distance from the front of the [car] and angling it toward the [car]." Parker argues that to leave the lot, Pack would have had to drive on the wrong side of the road in view of the Officers, and that combined with the simultaneous approach of the two Officers towards Parker's vehicle, a seizure occurred prior to the time Officer Burkey smelled marijuana. The Government argues "[t]his is a distinction without a difference as in both circumstances there is no evidence before the Court that the officers blocked the defendant's vehicle." (Doc. 43.)

This Court finds Defendant's arguments unpersuasive. The Officers did not block the vehicle's egress, and although Pack would have had to drive around the police cruiser to exit the lot, the photographic evidence presented at the suppression hearing demonstrated that there was sufficient room to do so given the width of the parking lot entrance. Parker's argument that the vehicle would have had to drive on the wrong side of the road is unconvincing, as these events took place in a private parking lot. The facts in *Dingess* are similar to the facts in this case, and support this Court's conclusion that a seizure did not occur until after Officer Burkey had developed reasonable suspicion.

## IV. CONCLUSION

This Court finds Defendant's argument that all physical evidence and statements should be suppressed unpersuasive because no illegal seizure occurred. For the reasons set forth in this Opinion, Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

                                                    **s/ Algenon L. Marbley**
                                                    **Algenon L. Marbley**
                                                    **United States District Judge**

**Dated: January 5, 2012**